In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-04-501 CR


____________________



NAKEESHA DURGAN, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 159th District Court


Angelina County, Texas


Trial Cause No. 22474






OPINION


 This cause is before us on remand for consideration of the merits of Nakeesha
Durgan's incompetency claim. Durgan had contended that she was incompetent when the
trial court revoked her deferred-adjudication community supervision and sentenced her to ten
years' imprisonment, and we dismissed her appeal for lack of jurisdiction. See Durgan v.
State, 192 S.W.3d 884, 887 (Tex. App.-Beaumont 2006), rev'd, 240 S.W.3d 875 (Tex. Crim.
App. 2007). Determining that we had jurisdiction to consider the issue, the Court of
Criminal Appeals reversed and remanded. See Durgan v. State, 240 S.W.3d 875, 878 (Tex.
Crim. App. 2007). Because we find that the trial court erred, we abate and remand this cause
to the trial court for a determination of whether Durgan was incompetent at the time of her
adjudication hearing. 

I. BACKGROUND
 

 In October 2001, Durgan pled guilty to delivery of less than one gram of cocaine in
a drug-free zone, i.e., within 1,000 feet of the premises of an elementary school. Pursuant
to a plea agreement, the trial court deferred Durgan's adjudication and placed her on five
years' community supervision. Approximately two years later, the State filed a motion to
adjudicate alleging that Durgan had violated her community supervision. As part of an order
imposing additional terms of supervision, the trial court ordered Durgan to reside in a
"Special Needs Substance Abuse Felony Punishment Facility" for a period not to exceed one
year and continued her on supervision. In 2004, the State filed a second motion to adjudicate
and alleged that Durgan had failed to attend and successfully complete the facility's program.
The trial court found that Durgan had violated the terms and conditions of her community
supervision as alleged, found her guilty, and sentenced her to ten years' imprisonment.

 Durgan filed a motion for reconsideration, or in the alternative, a new trial. Her
motion asserted that the judgment and sentence should be set aside and a new trial granted
because new evidence showing Durgan's mental and behavioral problems had been
discovered since trial. After a hearing, the trial court denied the motion.

II. DURGAN'S ISSUE



 On appeal, Durgan contends that the trial court erred in not having her evaluated to
determine if she was incompetent to stand trial for a revocation hearing. Durgan contends
that the trial court, sua sponte, should have ordered an inquiry into whether she was
incompetent. Durgan argues that the new evidence about her "history of mental and
behavioral problems" raised an issue about whether she was competent when the trial court
heard the motion to adjudicate her guilt. See Tex. Code Crim. Proc. Ann. art. 46B.003
(Vernon 2006). 

 Durgan first raised incompetency in her motion for new trial. The State did not argue
before us or at the new trial hearing that the evidence presented by Durgan was not new.
Further, the record before us shows that the documents supporting Durgan's claim became
a part of the clerk's record on January 7, 2005, the same day that the documents were
admitted into evidence at the new trial hearing.

III. BONA FIDE DOUBT


 The Texas Court of Criminal Appeals recently reiterated that trial courts use the "bona
fide doubt" standard in determining whether the court is required to sua sponte order a
defendant's evaluation for mental incompetency. Fuller v. State, No. AP-74980, 2008 WL
1883441, at *4 (Tex. Crim. App. April 30, 2008) (citing Pate v. Robinson, 383 U.S. 375, 86
S.Ct. 836, 15 L.Ed.2d 815 (1966)); see also Tex. Code Crim. Proc. Ann. art. 46B.004-.005
(Vernon 2006). A defendant is incompetent to stand trial if he does not have: "(1) sufficient
present ability to consult with [his] lawyer with a reasonable degree of rational
understanding; or (2) a rational as well as factual understanding of the proceedings against
[him]." Tex. Code Crim. Proc. Ann. art. 46B.003(a). "If any evidence that suggests the
defendant may be incompetent to stand trial comes to the trial court's attention, the trial court
shall sua sponte 'suggest that the defendant may be incompetent to stand trial' and then
'determine by informal inquiry whether there is some evidence from any source that would
support a finding that the defendant may be incompetent to stand trial.'" Fuller, 2008 WL
1883441 at *4 (quoting Tex. Code Crim. Proc. Ann. art. 46B.004 (b), (c)).

 The Fuller Court defined a "bona fide doubt" as "'a real doubt in the judge's mind
as to the defendant's competency.'" Id. (quoting Alcott v. State, 51 S.W.3d 596, 599, n.10
(Tex. Crim. App. 2001)). "Evidence raising a bona fide doubt 'need not be sufficient to
support a finding of incompetence and is qualitatively different from such evidence.'" Id. 
Rather, the evidence creates bona fide doubt when "it shows 'recent severe mental illness,
at least moderate retardation, or truly bizarre acts by the defendant.'" Id. (quoting McDaniel
v. State, 98 S.W.3d 704, 710 (Tex. Crim. App. 2003)) (emphasis added). 

 Thus, Fuller resolves recent questions about applying the bona fide doubt standard
to incompetency issues raised during trial. (1)
 Id. at *5 (explaining that none of defendant's
evidence presented during trial created a bona fide doubt about incompetence). Fuller,
however, does not address whether that standard also applies when competency is raised for
the first time in a motion for new trial, as Durgan did here. See Fuller, 2008 WL 1883441,
at *4, 5. 

IV. TRADITIONAL STANDARD: MOTION FOR NEW TRIAL


 Several appellate courts have recognized that a convicted person may challenge her
competency to stand trial in a motion for new trial. See Godoy v. State, 122 S.W.3d 315, 320
(Tex. App.-Houston [1st Dist.] 2003, pet. ref'd) (motion to revoke community supervision);
Purchase v. State, 84 S.W.3d 696, 699 (Tex. App.-Houston [1st Dist.] 2002, pet. ref'd) (jury
conviction); Edwards v. State, 993 S.W.2d 171, 175 (Tex. App.-El Paso 1999, pet. ref'd)
(guilty plea); Brown v. State, 960 S.W.2d 772, 778 (Tex. App.-Dallas 1997, pet. ref'd)
(guilty plea). Generally, when a defendant raises incompetency in a motion for new trial, the
trial court does not determine if the evidence raises a bona fide doubt about competence. See
Purchase, 84 S.W.3d at 699; Brown, 960 S.W.2d at 778. Rather, the trial court "applies the
normal standard used in deciding a motion for new trial under which the trial court considers
all the evidence presented, judges the credibility of witnesses, and resolves conflicts in the
evidence." Purchase, 84 S.W.3d at 699 (citing Edwards, 993 S.W.2d at 176; Brown, 960
S.W.2d at 778). The appellate court reviews the trial court's decision under an abuse of
discretion standard and reverses only if the court makes an unreasonable or arbitrary
decision. See Lewis v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); Purchase, 84 S.W.3d
at 699. 

 But, Godoy, Purchase, Edwards, and Brown, all of which applied the traditional
motion for new trial standard, were decided before the 2003 changes in the incompetency
statute became effective in 2004. (2) See Godoy, 122 S.W.3d at 315 (2003); Purchase, 84
S.W.3d at 696 (2002); Edwards, 993 S.W.2d at 171 (1999); Brown, 960 S.W.2d at 772
(1997). The former statute provided: "If during the trial evidence of the defendant's
incompetency is brought to the attention of the court from any source, the court must conduct
a hearing out of the presence of the jury to determine whether or not there is evidence to
support a finding of incompetency to stand trial." Act of May 29, 1975, 64th Leg. R.S., ch.
415, 1975 Tex. Gen. Laws 1095-96, repealed by Acts of April 30, 2003, 78th Leg. R.S., ch.
35 § 15, 2003 Tex. Gen. Laws 72 (emphasis added). In considering the former statute's
language, some courts have found that a hearing on a motion for new trial was not "during
trial." See Oku v. State, 21 S.W.3d 689, 691-92 (Tex. App.-Austin 2000, no pet.); Taylor
v. State, 948 S.W.2d 827, 832 (Tex. App.-San Antonio 1997, pet. ref'd); see also 42 George
E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure §
26.81 (2d ed. 2001).

 Under the former statute, some commentators argued for an expanded reading of 
"during trial":

 The general tendency to read the term trial broadly makes a great deal of sense. 
The Code no longer has any provision for inquiry into impairment after trial
but where the defendant is not imprisoned. Yet persons being so processed
judicially are obviously entitled under federal due process standards to inquiry
into competency if the facts raise the issue. Only if "during the trial" is
construed broadly does article 46.02 properly provide for this.


Dix & Dawson, supra, § 26.81 (emphasis added). 

 

 After the 2003 revisions deleted the "during trial" requirement, (3)
 the commentators 
concluded: "The 2003 revision eliminated the troublesome language in the predecessor
statute. Now, the court's duty to raise or inquire into competency is unrestricted by any such
terminology." Dix & Dawson, supra, § 26.81 (Supp. 2007). The elimination of the
"troublesome language," however, raises certain questions. With no requirement that a
court's inquiry be confined to "during trial," should a post-trial inquiry be conducted under
the bona fide doubt standard or the traditional motion for new trial standard? Durgan hints
that the Court of Criminal Appeals might, with respect to an incompetency inquiry, extend
a bona fide doubt standard to the motion for new trial stage of the proceedings. 

 The Durgan Court explained that an assertion about a defendant's incompetency at
the time of an adjudication hearing "raises a preliminary due-process issue that must be
resolved before the adjudication process may begin." Durgan, 240 S.W.3d 875 at 878 (citing
Cooper v. Oklahoma, 527 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). In
addition, the Court pointed to facts presented by witnesses at Durgan's new trial hearing and
stated that some of their testimony "supported a conclusion of mild to moderate mental
retardation for appellant." Durgan, 240 S.W.3d at 876. Moderate retardation, of course,
raises bona fide doubt. See Fuller, 2008 WL 1883441, at *4. Thus, Durgan could be
interpreted as suggesting that the bona fide doubt standard should be used when a defendant
raises incompetency in a motion for new trial. 

 In this case, however, we need not determine whether bona fide doubt is the proper
standard for the trial court to use when a trial court evaluates an incompetency question post-trial. With respect to the facts before the trial court in this case, an existing procedure allows
us to address any due process concerns that may be presented by the post-trial evidence. See 
Brown v. State, 960 S.W.2d at 775.

V. CONSIDERATION OF POST TRIAL EVIDENCE


 In Brown, the Dallas Court of Appeals recognized that, under certain circumstances,
an appellate court may consider post-trial evidence in determining if the trial court erred by
not conducting an incompetency inquiry during trial. Id. This circumstance arises "when
evidence presented at a motion for new trial hearing serves to explain or define evidence of
incompetence that was already before the court during trial." Id. at 776 (citing Morrison v.
State, 795 S.W.2d 276, 278-80 (Tex. App.- Houston [14th Dist.] 1990, no pet.)) (considering
post-trial evidence in remanding cause to trial court for jury determination of competency);
see also Oku v. State, 21 S.W.3d at 691. As explained below, the Brown analysis is
appropriate here because the significance of the trial evidence only becomes apparent when
it is viewed in light of the post-trial evidence. 

A. Trial Evidence


 Available to the court at the adjudication hearing were documents from the clerk's
record and testimony suggesting that Durgan had some degree of mental incompetency. The
documents included the following:


 The trial court's deferred adjudication order dated October 12, 2001, that
included a community supervision requirement for Durgan to take all
medication prescribed by the Burke Center Mental Health/ Mental Retardation
facility or by her physician.




 An August 2003 violation report from Durgan's caseworker supervisor
included the following notations regarding rehabilitative measures: (1)
"Referral to Mentally Impaired Offender Caseload-Defendant has limited
mental capacity"; and (2) "Burke Center M.H.M.R. Facility-Defendant has
been a patient at various times." 

 The State's first motion to adjudicate, filed in September 2003, listed the same 
"rehabilitative measures" contained in the August violation report. 

 An additional probation term imposed on Durgan in September 2003 that
ordered her sent to a "special needs" Substance Abuse Felony Punishment
Facility (SAFPF) for no more than one year.

 A subsequent SAFPF progress report to the trial court stating that Durgan was
"low functioning" but also was not making the effort to do what she was
"capable of doing."


 

 After Durgan pled "not true" to the allegation that she did not complete the SAFPF
program, the trial court heard testimony from Marcie Anthony and Durgan. Anthony
supervised offenders sent by the trial court to SAFPF, including Durgan. Anthony testified
that Durgan was sent to a "special needs" SAFPF because she "has a low level of mental
capability." Anthony further testified that Durgan was capable of completing the SAFPF
program and that the "special needs" program was "geared" for offenders with her mental
capabilities. 

 On direct examination, Durgan contended that she completed the SAFPF program
and that she was not "kicked out" of the unit. She also testified that she did not know why
she was back in court. When asked on cross-examination whether she thought the testimony
about her misbehavior was "simply a big mistake," Durgan responded, "Yes, sir." 

 None of the evidence before the court at the adjudication hearing, however, raised 
questions about whether Durgan had "a recent severe mental illness," was "at least"
moderately retarded, or had exhibited "truly bizarre" behavior. See Fuller, 2008 WL
1883441, at *4 (quoting McDaniel, 98 S.W.3d at 710). 

 As to the documents before the trial court during the trial, they showed that Durgan
had "limited mental capacity," was "low functioning," was referred to as a "mentally
impaired caseload," was required to take medication prescribed by an MHMR facility, and
was sent to a special needs SAFPF. Nothing shows that either the MHMR facility, the
supervisor handling the caseload, or the special needs SAFPF dealt only with moderately
retarded individuals, as opposed to those who have mild retardation. As noted in Briseno,
mental retardation includes several categories and most persons who are classified as
mentally retarded are mildly mentally retarded, rather than moderately mentally retarded. Ex
parte Briseno, 135 S.W.3d 1, 5-6 (Tex. Crim. App. 2004). (4)
 Thus, evidence that a defendant
is mentally retarded is not evidence of "at least" moderate mental retardation, the evidence
of which is generally sufficient to create a bona fide doubt about a defendant's incompetence
to stand trial. See Fuller, 2008 WL 1883441, at *4.

 As to the witnesses who testified at trial, Anthony's testimony showed that Durgan
had a low level of mental capability and that she participated in the special needs SAFPF.
Durgan testified that she completed the SAFPF program when she had not, and she
contended that she did not understand why she was at the hearing. This testimony could
reasonably be viewed as being consistent with her belief that a "big mistake" had occurred
rather than as showing she was unable to understand the proceedings. Further, when the trial
court asked her directly about whether she understood the State's contentions and the
possible consequences, she replied, "Yes." Thus, none of the hearing evidence, taken by
itself or together, shows that Durgan had difficulties communicating with her attorneys or
was unable to understand the proceedings. In fact, neither of the attorneys who represented
her before the trial court ever complained that her mental limitations made her unable to
consult with them or that she could not understand the proceedings. Compare Moore v.
State, 999 S.W.2d 385, 393-94 (Tex. Crim. App. 1999). 

 Thus, the evidence before the court at the adjudication hearing was insufficient to
require the court to order Durgan's examination to determine if she was mentally
incompetent. Nevertheless, as explained below, the post-trial evidence assists in a better
understanding of the evidence previously presented to the trial court. 

B. Post-Trial Evidence


 Under Brown, we may consider whether the evidence presented at the motion for new
trial hearing "serves to explain or define evidence of incompetence that was already before
the court during trial." Brown, 960 S.W.2d at 776. At the hearing on Durgan's motion for
new trial, the court heard the testimony of several witnesses. The trial court also admitted
into evidence various records, all of which were part of an evaluation of Durgan to determine
whether she qualified for vocational training through a county program. 

Records 


 The records consisted of Durgan's social history, a medical/psychiatric assessment, 
a psychological assessment, a developmental assessment, and a summary containing the
reviewing team's recommendations. The Court of Criminal Appeals noted that all of these
records "included an introductory heading of 'Determination of Mental Retardation.'" 
Durgan, 240 S.W.3d at 876.

 Most, but not all, of these records are consistent with a diagnosis of mild mental
retardation. Durgan's records included psychological assessments and included findings by
two psychologists. One concluded that generally she was performing at or below third grade
level in reading, spelling, and arithmetic. The other psychologist found that Durgan's
"performance on the current assessment indicated an overall level of intellectual functioning 
within the range of Mild Mental Retardation. . . ." However, Durgan "appeared to be
functioning adaptively within the range of Moderate Mental Retardation with the potential
of functioning within the range of Moderate Mental Retardation." The psychologists'
records reflect that Durgan's performance on the Vineland Adaptive Behavior Scale (VABS)
indicated "an overall level of adaptive functioning within the range of Moderate Mental
Retardation." The findings further noted that Durgan appeared to "possess all of her basic
self-help skills such as independent bathing, grooming . . ." but had "significant related
limitations" in "adaptive skill areas," namely "social skills, self-direction, and functional
academics (Mental Retardation, 9th Edition, AAMR, 1992)."

Witnesses 


 Teresa Anderson reviewed Durgan's records but did not meet or interview her.
Anderson testified that she was the director of special education programs at Hudson School,
had a master's degree in special education, and was certified as an educational diagnostician.
Anderson stated that Durgan's overall scores were in the mild range of mental retardation but
that Durgan had several scores placing her in the moderate range. Anderson explained that
a person with mild retardation would be "likely to need ongoing supervision and support and
would likely be someone who requires specialized services in order to achieve in school and
after school." For a person with moderate retardation, "more services and support would be
necessary, and closer supervision would be necessary and probably a lot more practice in
trying to master just basic daily living skills."

 Anderson further asserted: "It's generally accepted that persons with mild mental
retardation will academically sort of plateau at the sixth-grade level of academic skills,
school-based activities. Of course, that's not to say all of them reach that level, and some of
them maybe go above that; but that's sort of generally accepted in most cases." Anderson
noted that Durgan was below the third-grade level at the time the tests were given.

 Anderson also testified that it "would be real difficult" for a person with Durgan's
scores to have much insight. Anderson opined that a person with Durgan's scores would not
be smart enough to anticipate consequences and that she would be easily influenced. 
According to Anderson, others could "influence [Durgan] into actions that ordinarily" she
would not take. As to typical thought processes, such a person would be considering what
was "happening immediately at any given time, without a lot of ability to consider
impact . . ." or what might "be the next thing that may happen as a result of actions." 
Anderson explained that Durgan functions at a significantly lower level intellectually than
other persons.

 The trial court asked Anderson whether she was qualified to give an opinion as to
whether Durgan "would know right from wrong in terms of securing something that was
legal, as distinguished from that which is illegal?" Anderson stated that she could not make
that determination. No one, however, asked Anderson whether Durgan, at the time of trial,
would have had "sufficient present ability to consult with" her lawyer "with a reasonable
degree of rational understanding" or whether Durgan would have had "a rational as well as
factual understanding of the proceedings." See Tex. Code Crim. Proc. Ann. art. 46B.003. 

 Mark Johnson, Durgan's cousin, testified at the hearing. He stated that he "grew up"
with Durgan in Lufkin and that they were reared in the same home. He said that he was
familiar with Durgan's mental capacities and that others, such as a drug dealer, had taken
advantage of Durgan. Johnson stated that Durgan did "not really" know the difference
between right and wrong.

 Durgan also testified at the hearing on her motion for new trial. When asked whether
she knew why she was in court that day, she said: "No, sir." When asked what kind of trial
she had in November 2004, she stated: "It's hard to say." She did not remember when she
graduated from high school, but she agreed it would have been when she was 17 or 18. She
also contended that she completed the Substance Abuse Felony Punishment Facility
("SAFPF") program.

 The State again called Durgan's supervisior, Marcie Anthony, the SAFPF officer for
Angelina County Adult Probation Department. Anthony explained that Durgan was
sentenced to a special needs facility because of "her low mental capacity." Anthony also
testified said Durgan "was a behavioral problem" in the program. She would either refuse
to go to group sessions or would get up and walk out. According to Anthony, Durgan cursed
at the staff and her peers and threatened them with physical violence.

Analysis


 At the new trial hearing, Durgan presented some evidence indicating that she has 
moderate mental retardation. Durgan's psychological assessment stated that "[s]he appeared
to be functioning adaptively within the range of Moderate Mental Retardation with the
potential of functioning within the range of Moderate Mental Retardation." This professional
suggestion of moderate retardation presents a different prism for viewing the trial evidence.

 At the adjudication hearing, Durgan testified that she had completed the SAFPF
program, when in fact she had not. Further, she stated that she did not know why she was
back in court, perhaps indicating a lack of understanding about the proceedings' nature.
According to the post-trial expert testimony presented by Teresa Anderson, a person with
Durgan's test scores would have little insight and would be unable to anticipate
consequences. Thus, the post-trial evidence helps to explain why Durgan could have such
misconceptions and misunderstandings. Lacking insight and the ability to anticipate
consequences, Durgan may not have understood that failure to complete the SAFPF program
constituted a violation of her community supervision. She may not have understood the
actual requirements for completing the SAFPF program and erroneously thought she had
completed it. She may not have understood that the reason she was in court was for the trial
judge to determine whether she had violated her supervision terms, and she may not have
understood that a consequence of violating her supervision terms was imprisonment. 

 The State does not challenge the credibility of the records that arguably support a
conclusion that Durgan has moderate mental retardation. Further, the State does not
challenge Anderson's testimony about the possible effects of moderate mental retardation.

 Thus, in the unusual circumstances presented in this case, we find the post-trial
evidence explains the evidence that was before the court during trial. Therefore, we consider
the post-trial evidence in evaluating whether the trial court erroneously failed to conclude
that "some evidence" existed under article 46B.004(c) "that would support a finding that the
defendant may be incompetent to stand trial." Tex. Code Crim. Proc. Ann. art. 46B.004(c);
see Brown, 960 S.W.2d at 776. Such evidence, of course, would trigger the requirements
for a determination of whether Durgan was incompetent. See Tex. Code Crim. Proc. Ann.
art. 46B.005. Based on the trial evidence and the post-trial evidence as examined above, we
conclude that the trial court erred by failing to determine that "some evidence" existed of
Durgan's incompetence; as a result the trial court erred in failing to order an examination of
Durgan under article 46B.005. Therefore, we sustain Durgan's sole issue before us on
remand.

VI. CONCLUSION


 Having sustained Durgan's sole issue, we abate this appeal and remand this cause to
the trial court for a retrospective determination under article 46B.005 of whether Durgan was
incompetent at the time of her adjudication hearing on November 2, 2004, if that can be
determined after the passage of over three and one-half years. See Tex. Code Crim. Proc.
Ann. art. 46B.004(c); Casey v. State, 924 S.W.2d 946, 949 (Tex. Crim. App. 1996); Hawkins
v. State, 660 S.W.2d 65, 85 (Tex. Crim. App. 1983); Brown v. State, 871 S.W.2d 852, 860
(Tex. App.-Corpus Christi 1994, pet. ref'd). The trial court shall forward its determination,
or its findings supporting its inability to make a determination, via a supplemental appellate
record within ninety days of the date of this order, and this appeal will be reinstated upon
receipt of the supplemental record. 

 ABATED AND REMANDED.


 ____________________________

 HOLLIS HORTON

 Justice


Submitted on January 4, 2008

Opinion Delivered June 25, 2008

Publish

Before McKeithen, C.J., Gaultney and Horton, JJ.
1. In 2007, the San Antonio Court of Appeals held that statutory changes enacted by the
Texas Legislature in 2003 abrogated the case law requirement that evidence raising a "bona
fide doubt" was necessary to trigger a competency inquiry. Greene v. State, 225 S.W.3d 324,
329, n.3 (Tex. App.-San Antonio 2007, no pet. h.). The Greene Court concluded that the
new statutory standard required less evidence than the bona fide doubt standard. Id. In doing
so, Greene compared the current statute, 46B.004(b), and its use of the terms "suggest" and
"suggestion" with the prior statute, art. 46.02, § 2(b), which did not use those terms. Id.;
compare Tex. Code Crim. Proc. Ann. art. 46B.004(b) (Vernon 2006), and Act of May 29,
1975, 64th Leg. R.S., ch. 415, 1975 Tex. Gen. Laws 1095-96, repealed by Acts of April 30,
2003, 78th Leg. R.S., ch. 35 § 15, 2003 Tex. Gen. Laws 72.

 Subsequent to the 2003 statutory change, however, at least two published opinions
applied the bona fide doubt standard. See Salahud-Din v. State, 206 S.W.3d 203, 208 (Tex.
App.-Corpus Christi 2006, pet. ref'd) (collecting unpublished cases that applied the standard
after the 2003 revisions); LaHood v. State, 171 S.W.3d 613, 618 (Tex. App.-Houston [14th
Dist.] 2005, pet. ref'd).

 


2. Since the 2003 statutory changes, however, at least three courts have applied the
traditional motion for new trial standard to incompetency issues raised in the motion. See
Beltran v. State, 2007 WL 4216541, at *2 (Tex. App.-Tyler 2007, no pet.) (not designated
for publication); Hill v. State, 2007 WL 866476, at *8 (Tex. App.-Fort Worth 2007, pet.
ref'd), cert. denied, 128 S.Ct. 1267 (2008); De La Cruz v. State, 2005 WL 564065, at *6
(Tex. App.-Houston [1st Dist.] 2005, pet. ref'd) (not designated for publication).
3. The current statute, article 46B.004 (Raising Issue of Incompetency to Stand Trial) 
provides in part:

 

 (a) Either party may suggest by motion, or the trial court may suggest on its
own motion, that the defendant may be incompetent to stand trial. A motion
suggesting that the defendant may be incompetent to stand trial may be
supported by affidavits setting out the facts on which the suggestion is made.

 (b) If evidence suggesting the defendant may be incompetent to stand trial
comes to the attention of the court, the court on its own motion shall suggest
that the defendant may be incompetent to stand trial.

 (c) On suggestion that the defendant may be incompetent to stand trial, the
court shall determine by informal inquiry whether there is some evidence from
any source that would support a finding that the defendant may be incompetent
to stand trial.

 (d) If the court determines there is evidence to support a finding of
incompetency, the court, except as provided by Subsection (e) and Article
46B.005(d), shall stay all other proceedings in the case.


Tex. Code Crim. Proc. Ann. art. 46B.004.

4. In Briseno, the Court of Criminal Appeals explained that 


 "mental retardation" encompasses a large and diverse population
suffering from some form of mental disability. The DSM-IV
categorizes the mentally retarded into four subcategories: 
mildly mentally retarded, moderately mentally retarded, severely
mentally retarded, and profoundly mentally retarded. Some 85%
of those officially categorized as mentally retarded fall into the
highest group, those mildly mentally retarded, but "mental
retardation is not necessarily a lifelong disorder." The
functioning level of those who are mildly mentally retarded is
likely to improve with supplemental social services and
assistance. It is thus understandable that those in the mental
health profession should define mental retardation broadly to
provide an adequate safety net for those who are at the margin
and might well become mentally-unimpaired citizens if given
additional social services support.


Ex parte Briseno, 135 S.W.3d 1, 5-6 (Tex. Crim. App. 2004) (citing American
Psychiatric Association diagnostic and Statist ical Manual of Mental Disorders
(Text Revision, 4th ed. 2000) (DSM-IV) 41-42, 44)).